# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3  _____

4  Brock Fredin,

5           Plaintiff,

6     v.                          No. 17-03058 (SRN/HB)

7  Lindsey Middlecamp,

8           Defendant.

9  _____

10  Brock Fredin,

11           Plaintiff,

12     v.                          No. 18-cv-00466(SRN/HB)

13  Grace Elizabeth Miller and

14  Catherine Marie Schaefer,

15           Defendants.

16  _____

17

18           DEPOSITION OF BROCK FREDIN

19             Taken December 5, 2019

20             Scheduled for 9:30 a.m.

21

22

23

24

25  REPORTED BY: JONATHAN WONNELL, RMR

1  Dave Middlecamp or people re-tweeting the Twitter

2  campaign to her social media, as well as several

3  attorneys -- she's an attorney -- contacted her about

4  that.

5          You're in the same NF court that she runs

6  and managed -- manages based off of Chief Justice

7  Douglas Andahl, and -- so some of the communications

8  related to that.  Several attorneys in the NF court

9  came through to ask her about the entire situation.

10     Q     And you learned this through e-mails you

11  had with her?

12     A     No.  This was communication, a family

13  communication.

14     Q     Oral communication?

15     A     Correct.

16     Q     How did you search for documents

17  responsive to our document requests?  How did you

18  search your e-mail files, for instance?

19     A     I did keyword searches.

20     Q     What keywords did you use?

21     A     I used keywords related to Lindsey

22  Middlecamp, Grace Miller, Catherine Schaefer-ish case

23  caption:  Miller versus Fredin, Schaefer versus

24  Fredin, Middlecamp versus Fredin.  I did captions

25  for -- or searches for CardsAgstHrsmt.  I did other

Page 41

1   searches for David McCabe.  I did keyword searches

2   related to my work history.

3          Essentially, every single interrogatory I

4   received I did keyword searches related to those

5   questions.

6      Q    Did you produce all the documents that

7   those keyword searches identified?

8      A    Absolutely, yes.

9      Q    You didn't exclude any of them?

10     A    That's true.

11     Q    Who's Sarah -- is it Logghe?

12     A    Sarah Logghe.

13     Q    Who is she?

14     A    Sarah Logghe is an ex-girlfriend.

15     Q    When did she become an ex-girlfriend?

16     A    I'm not sure.  I have to check.

17     Q    Was it within weeks or months?  A year

18   ago?

19     A    I would have to check my records.  I'm not

20   sure.  Ballpark, sure.

21     Q    Well, which ballpark?

22     A    What you just mentioned.

23     Q    Week, months, or a year?

24     A    Within the past year.

25     Q    Within the past six months?

Page 42

1    A    I'd have to check.  I'm not sure.

2    Q    And what information does she -- what

3    information do you believe she has with respect to

4    the lawsuit?

5    A    Everything.  She knows everything.

6    Q    Because you spoke to her about it?

7    A    Correct.

8    Q    E-mailed with her?

9    A    No.

10   Q    Text messages?

11   A    No.

12   Q    Social media?

13   A    No.  We -- at the time we -- I believe

14   that she connected with her family through Facebook,

15   but there was nothing related.

16   Q    So you've had no communication with her

17   during the time that the two of you were together

18   about this case either by e-mail, text message or any

19   social media platform.  Is that your testimony?

20   A    Can you restate the question?

21   Q    During the time that you and her were

22   together, you never texted, e-mailed or engaged in

23   social media communications with her regarding the

24   allegations in these two lawsuits?

25   A    It was emotional-content based.  I believe

1    that perhaps -- I never used Lindsey Middlecamp,

2    Catherine Graver, Grace Miller's name.  I never

3    referenced the actual Twitter campaign or the City

4    Pages article or a number of other articles stemming

5    from, like, Reason.com, Eugene Bullock's article or

6    Hacker News.  I believe that that was simply

7    in-person communication.  If anything, maybe I talked

8    in generalities in text message with her.  I did

9    keyword searches, and I did not find specific

10   information I mentioned in the interrogatories or the

11   requests for documents.

12        Q    Do you still have these communications

13   with her saved somewhere?

14        A    I do.  And I looked through them, and I

15   did not find any substantive messages that matched

16   interrogatories or requests for documents.

17        Q    You've used the phrase "emotional content"

18   now twice related to documents you've decided not to

19   produce in this case.  What do you mean by "emotional

20   content"?

21        A    Tortured mental states related to

22   inability to obtain employment in my career field,

23   and, you know, depression surrounding being doxed and

24   ruined, not being able to basically function in the

25   regular world for now three to four years.

1    Q       And so the decision not to produce those

2    documents was based on what?

3    A       The requests for documents and the

4    interrogatories weren't specific enough to target

5    that information.  We're talking about generalities

6    in relationship that simply were not matched with the

7    specific questions.

8    Q       Did you keep a log of the e-mails or the

9    documents you decided not to produce?

10   A       I did include a deleted log showing

11   potentially deleted files pursuant to your

12   interrogatory requests for documents, the legalese

13   around it.  I provided a PDF and a Microsoft Word

14   document at the root of the discovery folders.

15   Q       And it's of an in-box?

16   A       It's in the Dropbox.

17   Q       And you believe it contains what?

18   A       A log of deleted files or inaccessible

19   files.

20   Q       From your Gmail account?

21   A       No.  Just files on a computer.

22   Q       Why are they inaccessible?

23   A       The computers were stolen, based off of

24   Lindsey Middlecamp's violent SWAT raid to serve her

25   restraining order related to her corrupt self-dealing

1  in the Minneapolis City Attorney's Office where she

2  was acting both as a Minneapolis Assistant City

3  Attorney and using that position to essentially

4  launch this SWAT raid against me to serve her

5  restraining order.  All of my computers were taken,

6  stolen, essentially, and when they were returned had

7  significant file changes to them.

8      Q    When you say they were stolen, they were

9  taken by the police, correct?

10     A    I believe that they were taken to delete

11  information related to Lindsey Middlecamp's leaking

12  of the Miller restraining appellate decision, which

13  she leaked before its official release.  Any

14  information related to that was deleted when I

15  reviewed the computers after they were returned.

16          In addition to that, for example, I had

17  screen shots of the Twitter posts before January 23rd

18  or 19th, when that -- whenever the Miller restraining

19  decision was released.  I had screen shots of her

20  Twitter post, I believe, in mid-January showing her

21  knowledge that Judge Ross had essentially smeared me

22  in his appellate decision.  And then she had posted

23  that on Twitter, and then she later deleted it and

24  then restarted it again.

25          So the gist of this is the fact that those

1   documents were deleted or made inaccessible by way of

2   Lindsey Middlecamp's extra-judicial actions to launch

3   a SWAT raid against me.  Once those items were

4   returned to me, I also declined to review or hook up

5   those machines to my network in fear of the fact that

6   the police could have installed software to monitor

7   my location, to stalk me on behalf of Lindsey

8   Middlecamp.

9       Q     So upon return of these devices, you did

10  not plug them in to verify what information was or

11  was not on them?

12      A     I did, actually, on one machine, but the

13  other machines I have not.

14      Q     And your allegation is the police

15  department specifically deleted files related to

16  Lindsey Middlecamp?

17      A     I am not making that allegation.  I am

18  simply saying it's my belief that those documents

19  were suddenly not accessible by me after the SWAT

20  raid.

21      Q     But you're not blaming Lindsey Middlecamp

22  for that?

23      A     I am saying upon information and belief,

24  Lindsey Middlecamp extra-judicial actions led to the

25  fact that she was trying to cover up her leaking of

1   the Miller restraining decision.

2       Q      What evidence do you have that the files

3   were, in fact, deleted or rendered inaccessible by

4   the police department?

5       A      Because Lindsey Middlecamp has record of

6   the fact that she had posted on Twitter before the

7   official release, and she has record of her

8   conversation on January 24th with a deputy

9   Minneapolis city attorney, Mary Ellen Heng, in which

10  she promoted a prosecution on behalf of her friend,

11  Catherine Schaefer, and those records are directly

12  linked to Tara Patet, who is a St. Paul assistant

13  city attorney, where she then communicated with David

14  McCabe, who is the individual who petitioned for the

15  search warrant in St. Croix, Wisconsin, to raid my

16  house in Hudson, Wisconsin.  And --

17      Q      Mr. Fredin, the question was:  What

18  evidence do you have that the police department

19  either deleted or made inaccessible files of yours on

20  the devices that they took?

21      A      Yes.  The information I have is related to

22  the search warrants, the pictures from the SWAT raid,

23  the pictures of all my devices, the logs of all my

24  devices that the St. Paul Police took.  I also

25  provided pictures of those devices located in the

Page 48

1    St. Paul property room.  And then there were

2    modifications to files on those machines which I

3    reviewed following their return.

4         Q    When you say "modifications to files,"

5    what do you mean?

6         A    The file logs in UNIX indicated that

7    information was changed related to certain file

8    structures and files therein.

9         Q    Do you still have those logs?

10        A    Those logs are contained on the machine

11   that was taken.

12        Q    So you do not have the logs?

13        A    I do have the logs within the machine.  I

14   do not have them in a PDF document.  It would be way

15   too burdensome for me to go into that machine.  I

16   cannot, for security reasons, set up that machine at

17   this point in time.

18        Q    Mr. Fredin, you were asked in the

19   interrogatories that were provided to you to identify

20   the various user names and profiles that you use

21   online.  I'd like to go through some of those with

22   you now beginning with a user name "youareamazing,"

23   all one word.  That was used on Match.com; is that

24   correct?

25        A    Yes.

Page 90

1       Q      Does any of the profile information

2    contained in BlackOutx2 -- is any of that accurate

3    with respect to you?

4       A      No.

5       Q      The description of dominant couple.  That

6    doesn't make any reference to you, does it,

7    Mr. Fredin?

8       A      No.

9       Q      It's got height and weight of 6-4, 235

10   pounds.  There's no reference to you in that profile,

11   correct?

12      A      Correct.

13      Q      And then it says, "Orientation:  Bisexual.

14   Ethnicity, African descent."

15             Neither one of those is accurate with

16   respect to you, is it?

17      A      Correct.

18      Q      Is there any information at all in this

19   BlackOutx2 profile that would indicate that it's you,

20   Brock Fredin?

21      A      It's not me.  Your question is indicative

22   of the fact that all of this information is not

23   related to me in any way whatsoever.

24      Q      And it doesn't contain any e-mail

25   information, correct?

1     A     The BlackOutx2 profile does contain my

2  e-mail address because all these e-mails were

3  forwarded to me.  And then I believe that the profile

4  itself actually publicly made my e-mail visible in

5  the profile.

6     Q     You say you believe that.  Why do you

7  believe that?

8     A     I believe that because I received -- not

9  only did I receive these e-mails, but the profile I

10  think had that information and was modified

11  thereafter.

12     Q     The profile you provided to us here

13  doesn't contain your e-mail address, does it?

14     A     It does.

15     Q     Where?

16     A     It contains my e-mail address in the

17  profile settings where then all e-mails were

18  forwarded to me.

19     Q     But the profile doesn't publicly disclose

20  your e-mail address, correct?

21     A     The profile, upon viewing it, included my

22  e-mail address publicly, and then I believe that it

23  was later modified or amended.

24     Q     Is this the entirety of the BlackOutx2

25  profile that we see in Exhibit 5?

Page 92

1     A     No.

2     Q     What's missing?

3     A     The entire visible public profile.

4     Q     And where is that?

5     A     I produced that in discovery.

6     Q     What about the profile for epicviewfu?

7     A     What do you mean?

8     Q     Where is that profile?

9     A     I produced that in discovery.

10    Q     Mr. Fredin, you seem awfully confident you

11    produced these things in discovery.  Do you have

12    copies of what you produced to us or believe you

13    produced to us?

14    A     I do, yes.

15    Q     Because from our review, we didn't find

16    any of that documentation.

17    A     They're all there.  That's just a blatant

18    lie.  It's pretty insulting, actually.

19    Q     Other than the CollarSpace.com

20    communications, you had mentioned text messages and

21    knocks on the door that you claim constitute

22    nonconsensual sexual activity or sexual solicitation,

23    correct?

24    A     Yes.

25    Q     How many text messages?

Page 93

1      A      Hundreds, because at the time all of these
2  e-mails were forwarded to my phone, as well as
3  several other messages that I simply ignored.
4      Q      Okay.  And where are those hundreds of
5  text messages now?
6      A      I just ignored them at the time.  And I
7  just referenced the e-mails.  You know, I thought it
8  would go away within a few months, and so I just
9  ignored that.  The text messages are part and parcel
10  to the data provided here.
11      Q      All right.  But you didn't provide those
12  text messages to us, correct?
13      A      I did provide them part and parcel to all
14  this data here.
15      Q      When you say "part and parcel," I don't
16  understand what that means.  Did you provide the text
17  messages to us, yes or no?
18      A      Yes.
19      Q      Okay.  You say there's hundreds of text
20  messages?
21      A      Yes.
22      Q      And you're claiming that you produced
23  hundreds of text messages in this lawsuit?
24      A      I produced the e-mails, which were
25  forwarded as text messages.

Page 94

1    Q    So you're looking at Exhibit 7 again?

2    A    Exhibit 6.

3    Q    So when you say --

4    A    Exhibit 7.

5    Q    So you say "text messages," then, do I

6    infer that to mean that you would get a notification

7    in your in-box but you would also get a text message

8    with the same information?

9    A    At that time, that's the way that I had it

10   set up, as well as receiving several other text

11   messages related to this, people contacting me, that

12   I ignored.

13   Q    So the text messages, again, are --

14   contain the same messages that we saw in Exhibit 6?

15   A    Yes.  And the phone that I was using, I

16   never turned on again after the property was

17   returned.  So those text messages themselves are

18   simply unavailable.

19   Q    Where is that phone now?

20   A    That phone was deleted, and I believe that

21   it was sold on the internet.

22   Q    When was it deleted?

23   A    When I sold the phone on the internet, I

24   deleted the data associated with it.

25   Q    You didn't keep any copies?

Page 95

1      A      I didn't turn on the phone after -- well,
2  let me back up.  I don't recall if I turned it on.  I
3  did not turn on the phone.  I sold it on the
4  internet.  I don't remember, actually.
5      Q      Who did you sell it to?
6      A      I don't remember.
7      Q      How did you sell it on the internet?
8      A      I don't remember.
9      Q      When did you sell it on the internet?
10     A      For all intents and purposes, when I
11 received the property -- let me back up.
12            When I received the property back, because
13 there were so many items, they took 60 to 70 items,
14 that it was overwhelming.  And so the phone that this
15 stuff was on, I had like five or six phones.  I
16 couldn't remember exactly which phone I was using at
17 that time.
18            I sold one phone which could have been
19 that phone, and I may have the phone still in
20 property.  My life has been sort of in whack.  So I
21 don't know exactly where it is.  I believe that it's
22 in storage, in a storage unit in St. Louis Park
23 because my mom, before she died, had it, and she put
24 all of my stuff in a storage unit.  And I had one or
25 two phones, and I don't recall if that was the exact

Page 96

1    phone that I had when all of this went down.

2              But I ignored all of these text messages

3    that were forwarded and utilized simply the e-mails

4    themselves.

5         Q    Okay.  So you ignored them and you did not

6    read them?

7         A    I read them.

8         Q    Okay.  And you read them using the phone?

9         A    Correct.  They were push notifications on

10   the phone.

11        Q    Okay.  And the content of the text

12   message, is it the same as what's depicted in

13   Exhibit 6?

14        A    Yes.  In addition, I had received several

15   other direct text messages from individuals.

16        Q    But let's just stick with the

17   CollarSpace.com text messages.  You did not open

18   those messages to read the secondary content?

19        A    Correct.

20        Q    The other text messages that you

21   referenced, where did they come from?

22        A    Numbers.  Telephone numbers.

23        Q    Do you know where those text messages came

24   from or how they obtained your phone number to text

25   you?

Page 105

1    from CollarSpace.com -- does that make up the

2    entirety of your nonconsensual sexual solicitation

3    claim?

4         A    Generally.

5         Q    Well, are there any more incidences, text

6    messages or notifications that we haven't spoken

7    about that you'd like to include?

8         A    Just the deleted messages.  There were

9    about a hundred, maybe more than that, 120.  A couple

10   text messages that were custom text messages in

11   addition to the 120 text messages that were forwarded

12   from these e-mails.

13        Q    Those have all been deleted, correct?

14        A    I backed up on that because I'm not sure.

15   I did not open that phone after it was returned to

16   me.

17        Q    Okay.  And when you say the phone and it

18   being returned to you, it's when the police returned

19   your phone and other electronic devices?

20        A    That's true.

21        Q    And if the phone was sold that contains

22   this information, how close in time was it sold

23   between the time you received it back from the police

24   and the time that you sold it online?

25        A    I received five phones back, and I believe

Page 106

1    that I was using multiple phones at that time, like,

2    one or two phones, and like older models of iPhones

3    when I upgraded.  And so I'd use an older model, for

4    example, just for surfing the internet on the couch.

5           And so when I say I sold one of these

6    phones and your question was how soon thereafter the

7    SWAT raid, I believe that it was a year and a half

8    after that I may have sold one of the phones on the

9    internet in order to sustain myself because I was

10   unable to obtain employment during that period of

11   time.

12      Q    Okay.  You didn't search these phones that

13   you just referenced, these five phones?

14      A    That's correct.  I did not turn them on.

15      Q    So you have not searched those phones for

16   documents responsive to our discovery request?

17      A    I am unable to because they were

18   compromised by the St. Paul Police Department and any

19   data that was taken from them would be suspect,

20   because the St. Paul Police Department had modified

21   files anyways.  But they're on there.  I was unable

22   to do a search.

23           Plus the fact that I did not exactly know

24   where they were, and my living situation and

25   traveling between states is up in the air.  So it was

Page 126

1   storage unit?

2        A      Probably August.

3        Q      Other than the five phones you described

4   earlier, what other electronic devices may be in that

5   storage unit?

6        A      That's really a -- that's all I know.

7        Q      I'm sorry.  Did you give me a number?

8        A      No.  That's about it.  That's all I can

9   recall that is associated with documents.

10       Q      So there are no computers of any type?

11       A      Correct.

12       Q      Okay.  Did you search any of your

13  computers or did you only use the computer at the law

14  library?

15       A      I did search using a phone that I had.

16  And then when I was at the law library forwarded some

17  of the documents to the brockf12 account in order to

18  use their resources, essentially, to produce the

19  PDFs.

20       Q      From January of 2016 to present, what

21  computers, if any, have you used to communicate

22  either through Collarspace or these other online

23  profiles or the e-mails addresses that you provided?

24       A      The iMac that I had that was seized

25  pursuant to Lindsey Middlecamp's unlawful actions

Page 127

1  against me and then -- that's pretty much it.

2      Q     Okay.  And you haven't searched the iMac;

3  is that correct?

4      A     I can't turn it on because the files have

5  been compromised.

6      Q     Have you tried to turn it on?

7      A     No.

8      Q     When you refer to compromised files, again

9  we're talking about the police seizure of that device

10  as well with others?

11      A     I can't trust any devices that have been

12  seized by law enforcement.

13      Q     And where is that iMac today?

14      A     I believe that it's in the storage unit.

15  I'm sorry.  I'm contradicting myself.  It is in the

16  storage unit.  It's in storage.  I'm not trying to

17  intentionally mislead.  There's so many devices, I'm

18  just trying to associate specific devices to where

19  they're at.

20      Q     Yeah.  And if you want to correct the

21  testimony, I'm perfectly fine doing that.  I'd rather

22  get your best recollection rather than your guess.

23      A     My best recollection is that it's in the

24  storage unit.

25      Q     We talked about two Collarspace accounts

1   the revenge porn campaign that Lindsey Middlecamp

2   produces on CardsAgstHrsmt is eerily almost if not

3   identical to this sort of conduct.

4          For example, this is a shirtless black

5   man.

6   Q     All right.  So let's back up and try this

7   again.  How did you capture Ms. Schaefer's IP

8   address?

9   A     I received data from an analytics service.

10  Q     Which service?

11  A     Google Analytics.  Showing that HTTP

12  requests made to retrieve data were made, in

13  reference to this whole smear campaign, were made

14  from State College, Pennsylvania, and it indicated

15  her IP address at the same time that all of this was

16  going down.

17  Q     Well, you made the -- so Google Analytics

18  ran or captured the IP address related to what

19  communication or website?

20  A     I believe that it was a website dorseyhq

21  or lindseymiddlecamp.com.

22  Q     And those are websites that you created,

23  correct?

24  A     That's false.

25  Q     Well, how did you get the Google Analytics

Page 138

1  if they weren't websites that you had control over?

2      A      I received the information by way of a

3  friend, but I did not have direct knowledge of any

4  intentions or actions related to any websites going

5  up.

6      Q      Who's the friend?

7      A      I'm not going to answer that question.

8      Q      Why not?

9      A      Because it's not relevant.

10     Q      Well, you just described for me how you

11  obtained the IP address of my client through a

12  friend.  I'd like to know the friend's name.

13     A      Right.  And I'm not going to answer that

14  question.

15     Q      Well, Mr. Fredin, you're making a claim

16  that Ms. Schaefer created these false profiles

17  because you believe that her IP address is associated

18  with them.  You then tell me that the IP address was

19  obtained through two websites, lindseymiddlecamp.com

20  and dorseyhq, for which you say you don't control but

21  that are controlled by a, quote, unquote, friend.

22              So I'll ask you again, who's the friend?

23     A      I did a search of these websites.  They

24  don't exist.  Dorseyhq doesn't exist.

25  Lindseymiddlecamp doesn't exist.

1    Q    It did, because you just told me it did.

2    A    But it doesn't exist.  And the information

3  I received was simply for legal purposes to track

4  down through private investigators Catherine

5  Schaefer's involvement.

6    Q    Who developed the site dorseyhq and

7  lindseymiddlecamp.com?

8    A    I will object on relevance.

9    Q    They were created by Anthony Zappin,

10  correct?

11    A    Again, I'm objecting on relevance.

12    Q    You and Mr. Zappin collaborated on the

13  creation of those websites and other websites, true?

14    A    I'm objecting on relevance.

15    Q    You're refusing to answer the question as

16  to who created the website dorseyhq and

17  lindseymiddlecamp.com; is that correct?

18    A    I'm objecting on relevance.  I'm not

19  refusing to answer.

20    Q    Well, Mr. Fredin, there's a website with

21  my client's name attached to it along with some

22  harmful information contained within it.  How it's

23  not relevant, I don't understand.  But if you're

24  going to maintain the objection and not answer we can

25  certainly certify that question to the Court.  So I'm

Page 183

1   But you're refusing to answer any questions relating

2   to Mr. Zappin, is that my understanding?

3       A     Objection, asked and answered.

4                   (Fredin Exhibit 22 was marked for

5                   identification.)

6   BY MR. BREYER:

7       Q     Mr. Fredin, Exhibit 22 is the Twitter

8   account with the handle @mncourtshq.  Do you see

9   that?

10      A     Yes.

11      Q     This is an account that you created?

12      A     Objection, relevance.

13      Q     Are you going to answer the question?

14      A     No.

15      Q     You don't deny, then, that you did create

16  this document -- this Twitter handle?

17      A     I'm objecting on relevance.

18      Q     Much of the content in this Twitter handle

19  is in fact your post, correct?

20      A     I'm objecting on relevance.

21      Q     Do you still maintain this account?

22      A     I'm objecting on relevance.

23      Q     You're not answering the question?

24      A     I'm objecting on relevancy.

25      Q     And, again, you're refusing to answer?

Page 184

1        A     I'm not refusing to answer.  I'm just

2    objecting on relevance.

3        Q     Sure.  And now I want your answer now that

4    you've given your objection.  Are you going to give

5    me an answer?

6        A     No.

7                    (Fredin Exhibit 23 was marked for

8                    identification.)

9    BY MR. BREYER:

10       Q     So Exhibit 23 is a copy of a website that

11   was made for Catherine Schaefer and I should have

12   included it when we talked about the last two

13   websites, including the one with Grace Miller and

14   Ms. McQuitty.  You created this website as well; is

15   that correct?

16       A     Objection, relevance.

17       Q     You're not going to answer the question?

18       A     No.

19       Q     If you would turn to page 3 of this

20   document you can see some of the exhibits we looked

21   at today including those referencing BlackOutx2,

22   correct?

23       A     Yes.

24       Q     And that content you posted to this

25   website?

1      A     This content appears to show Catherine

2   Schaefer's revenge pornography targeting me.  It

3   appears to show a website promoting the fact that it

4   is Catherine Schaefer indeed targeting me, violating

5   the law.  That's what I see from this document.

6      Q     That's not my question.  My question is

7   you provided this content, correct?

8      A     Objection, relevance.

9      Q     You're not going to answer the question?

10     A     No.

11     Q     Is that a no?

12     A     No.

13     Q     If you look at the remaining pages of

14  Exhibit 23, it contains additional information,

15  Facebook posts and photos, all of which were sourced

16  from you, correct?

17     A     Objection, relevance.

18     Q     Are you going to answer?

19     A     No.

20              (Fredin Exhibit 24 was marked for

21              identification.)

22  BY MR. BREYER:

23     Q     You have before you Exhibit 24, which is

24  your complaint filed in Federal District Court of

25  Minnesota against Referee Clysdale amongst others,