# EXHIBIT C

Page 1

1          UNITED STATES DISTRICT COURT
2             DISTRICT OF MINNESOTA
3  ──────────────────────────────────────────────
4  Brock Fredin,
5          Plaintiff,
6     v.                         No. 17-03058 (SRN/HB)
7  Lindsey Middlecamp,
8          Defendant.
9  ──────────────────────────────────────────────
10 Brock Fredin,
11         Plaintiff,
12    v.                         No. 18-cv-00466(SRN/HB)
13 Grace Elizabeth Miller and
14 Catherine Marie Schaefer,
15         Defendants.
16 ──────────────────────────────────────────────
17
18           DEPOSITION OF BROCK FREDIN
19              Taken December 5, 2019
20              Scheduled for 9:30 a.m.
21
22
23
24
25 REPORTED BY: JONATHAN WONNELL, RMR

Page 137

```
 1   the revenge porn campaign that Lindsey Middlecamp
 2   produces on CardsAgstHrsmt is eerily almost if not
 3   identical to this sort of conduct.
 4              For example, this is a shirtless black
 5   man.
 6        Q     All right.  So let's back up and try this
 7   again.  How did you capture Ms. Schaefer's IP
 8   address?
 9        A     I received data from an analytics service.
10        Q     Which service?
11        A     Google Analytics.  Showing that HTTP
12   requests made to retrieve data were made, in
13   reference to this whole smear campaign, were made
14   from State College, Pennsylvania, and it indicated
15   her IP address at the same time that all of this was
16   going down.
17        Q     Well, you made the -- so Google Analytics
18   ran or captured the IP address related to what
19   communication or website?
20        A     I believe that it was a website dorseyhq
21   or lindseymiddlecamp.com.
22        Q     And those are websites that you created,
23   correct?
24        A     That's false.
25        Q     Well, how did you get the Google Analytics
```

1   if they weren't websites that you had control over?
2         A     I received the information by way of a
3   friend, but I did not have direct knowledge of any
4   intentions or actions related to any websites going
5   up.
6         Q     Who's the friend?
7         A     I'm not going to answer that question.
8         Q     Why not?
9         A     Because it's not relevant.
10        Q     Well, you just described for me how you
11  obtained the IP address of my client through a
12  friend.  I'd like to know the friend's name.
13        A     Right.  And I'm not going to answer that
14  question.
15        Q     Well, Mr. Fredin, you're making a claim
16  that Ms. Schaefer created these false profiles
17  because you believe that her IP address is associated
18  with them.  You then tell me that the IP address was
19  obtained through two websites, lindseymiddlecamp.com
20  and dorseyhq, for which you say you don't control but
21  that are controlled by a, quote, unquote, friend.
22              So I'll ask you again, who's the friend?
23        A     I did a search of these websites.  They
24  don't exist.  Dorseyhq doesn't exist.
25  Lindseymiddlecamp doesn't exist.

1    Q    It did, because you just told me it did.
2    A    But it doesn't exist.  And the information
3  I received was simply for legal purposes to track
4  down through private investigators Catherine
5  Schaefer's involvement.
6    Q    Who developed the site dorseyhq and
7  lindseymiddlecamp.com?
8    A    I will object on relevance.
9    Q    They were created by Anthony Zappin,
10  correct?
11    A    Again, I'm objecting on relevance.
12    Q    You and Mr. Zappin collaborated on the
13  creation of those websites and other websites, true?
14    A    I'm objecting on relevance.
15    Q    You're refusing to answer the question as
16  to who created the website dorseyhq and
17  lindseymiddlecamp.com; is that correct?
18    A    I'm objecting on relevance.  I'm not
19  refusing to answer.
20    Q    Well, Mr. Fredin, there's a website with
21  my client's name attached to it along with some
22  harmful information contained within it.  How it's
23  not relevant, I don't understand.  But if you're
24  going to maintain the objection and not answer we can
25  certainly certify that question to the Court.  So I'm

1  giving you another opportunity if you'd like to
2  disclose the name of your friend which you're legally
3  required to do, I hope you do it now.  Who's the
4  friend?
5       A     You mentioned content harmful to your
6  client, yet your client has refused and destroyed my
7  life on CardsAgstHrsmt, the City Pages, everywhere,
8  and yet you claim a website that doesn't exist is
9  somehow providing harmful content to your client.
10 The website does not exist.  So --
11      Q     Mr. Fredin --
12      A     And it's not relevant to this action
13 whatsoever.  So, again, if you find, you know, reason
14 to, you know, try and offer intimidation tactics to
15 claim somehow that your client is being harmed when
16 your client is in fact destroying me, the only thing
17 that I can remember is Lindsey Middlecamp's
18 destruction of my life.  And so I am objecting on
19 relevance to any other content where you're trying to
20 misdirect the intent of this lawsuit.
21            I am the plaintiff in this lawsuit against
22 your clients.  Your clients have harmed me.  So
23 there's no basis or relevance whatsoever for your
24 question.
25      Q     Mr. Fredin, you've testified -- you

1   testified.  I didn't offer you this information.  You
2   testified as to both of these websites that existed.
3   Now whether they exist today or not is not my
4   question.  The question is who did you collaborate to
5   create the websites?
6        A    I testified that analytical information
7   was produced in the complaint or the amended
8   complaint and/or the opposition on motion to dismiss.
9   And that information pertained to IP addresses.
10  That's all I'm testifying to.
11       Q    Right.  And I want you to tell me the
12  source of that information which you identified as
13  your friend.  Your friend's name is who?
14       A    I conducted a private investigation
15  through attorneys to determine, you know, IP
16  addresses associated and data therein.
17       Q    Which attorneys?
18       A    I'm going to object on attorney-client
19  privilege.
20       Q    The name of the attorneys is not covered
21  by the privilege.  The identification of the
22  attorneys, please.
23       A    The only thing that I can tell you with
24  reference to the identification of the attorney is
25  the fact that I retained at least two lawyers during

Page 142

1  this entire process and those lawyers' names are
2  included in all of the discovery that I've produced,
3  including the City Pages article.  And so those names
4  have been provided and I'm not in any way violating
5  attorney-client privilege.
6      Q   I'm not asking you to violate the
7  privilege.  I'm asking just for the names of the two
8  attorneys that you claim --
9      A   I produced those names.  Those names are
10 very easy to determine --
11     Q   Do you not recall their names?
12     A   I do recall their names.
13     Q   What are they?
14     A   The only reason that I am objecting on
15 attorney-client privilege is because I will have to
16 review whether or not the names or identities of
17 those lawyers are provided -- or covered, rather, by
18 attorney-client privilege.  If they're not, then I'll
19 answer your question as soon as I possibly can.
20 However, it's pretty obvious to find from notices of
21 appearances and so forth.
22     Q   Right.  So why wouldn't you just tell me
23 their names?
24     A   Because I'd have to review whether or not
25 the names or identities are included to determine

1  whether or not I am in full compliance.
2      Q    Well, you just told me they're on filings.
3      A    They are.  It's public.
4      Q    So they've already been disclosed, it's
5  public.  So I'm just asking you for that public
6  information.  What are their names?
7      A    I don't know if names are protected by
8  attorney-client privilege.
9      Q    Okay.  Let's go back to the friend,
10 because your friend is not a lawyer.  What's your
11 friend's name that set up these websites?
12     A    Again, I'm objecting on relevance.  I'm
13 not going to answer that question.
14     Q    Okay.
15              (Fredin Exhibit 13 was marked for
16              identification.)
17 BY MR. BREYER:
18     Q    Mr. Fredin, I've handed you what's been
19 marked as Exhibit 13.  And this is a website that was
20 created around Ms. Grace Miller.  Have you seen this
21 website before?
22     A    I have seen it.
23     Q    Did you create it?
24     A    I'm objecting on relevance.
25     Q    You won't answer the question whether you

Page 144

```
 1   created this website or not?
 2        A     Correct.
 3        Q     You provided content to this website,
 4   true?
 5        A     I'm objecting on relevance.
 6        Q     You had assistance in creating this
 7   website with the friend that you won't identify.  Is
 8   that also true?
 9        A     I'm objecting on relevance.
10        Q     Well, Mr. Fredin, I don't take your
11   relevancy objections very well, especially since
12   they're dealing with the direct content of the claims
13   in this lawsuit, including my client, Grace Miller.
14   So if you're going to continue that objection then
15   we'll simply go to the Court and get some redress.
16   But for now I need to know whether you participated
17   in the creation of the content of this website.
18        A     It appears to show a masculine woman who
19   looks like my ex-girlfriend, Grace Miller.
20        Q     The question was did you participate in
21   the content of this website, yes or no?
22        A     I see the photo of Grace Miller whose
23   masculinity I was attracted to.  I see Karmen
24   McQuitty's ex parte communication to her mother
25   defaming and taunting me on Facebook.  Yet Karmen
```

1  McQuitty and my ex-girlfriend, United States Air
2  Force Major Grace Miller, is using, according to this
3  content, restraining orders to silence and gag me
4  while at the same time defaming and taunting me,
5  which is ridiculous.  That's all I'm seeing from this
6  content here.
7           I don't know if this content that you're
8  producing is identical to what I've seen in court
9  filings.  When I say that I've seen this website,
10 this is a website that I've seen in court filings.
11      Q    Right.  So back to my question.  Did you
12 contribute to the content of this website contained
13 in Exhibit 13, yes or no?
14      A    I'm objecting on relevance.  I have no
15 understanding of how this is relevant to the claims
16 in this action.
17      Q    You're refusing to answer?
18      A    I'm not refusing to answer.  I am
19 objecting on relevance.
20      Q    Sure you are.  Right.  You've objected on
21 relevance and now you can answer the question.  Did
22 you participate in the content of this website?
23      A    I'm not going to answer this question.
24      Q    There are numbered pages in this document
25 and if you turn to pages 6, 7, 8, 9, so start with

1  those, these contain pictures and information that
2  you provided so that they could be posted on this
3  website, true?
4       A     False.
5       Q     Whose content is this?
6       A     This appears to show my mother who is
7  being taunted by Lindsey Middlecamp on Twitter.
8       Q     But those are your pictures of your
9  mother, correct?
10      A     I don't know that.
11      Q     In fact, this document contains a number
12 of pictures and posts that you've produced in this
13 litigation as well as in the lawsuits, correct?
14      A     Does this website exist is your question.
15 I don't believe that it does.
16      Q     Well, it might not exist now, but it did
17 because we've got evidence of it here and you've
18 testified to it.
19            Turn to page 14, 15 and 16.  Do you
20 recognize those pictures?
21      A     Yes.
22      Q     What are they?
23      A     They are pictures of the unlawful actions
24 taken by Lindsey Middlecamp to cover up her leaking
25 of the Miller versus Fredin appellate decision that

1   she leaked to her own Twitter platform before it was
2   released, which is felony obstruction of justice.
3        Q    They are pictures of your home or your
4   former home, correct?
5        A    They are pictures of Lindsey Middlecamp's
6   felony obstruction of justice and violent kidnapping.
7        Q    You provided those pictures to the
8   website, correct?
9        A    These pictures again show Lindsey
10  Middlecamp's felony obstruction of justice and
11  violence asserted against me.
12       Q    The question is that's the content, in
13  addition to other content, that you provided to the
14  website, correct?
15       A    I don't know that.  I don't know.  I can't
16  remember.  Objection on relevance.
17       Q    You're refusing to answer?
18       A    It's just -- all of this is not relevant
19  to the claims.
20       Q    I don't care about the relevance.  I want
21  to know if I'm going to get an answer, yes or no.
22       A    No.
23                 (Fredin Exhibit 14 was marked for
24                 identification.)
25

1     Q    Based on relevancy?
2     A    I'm not going to answer the question.
3     Q    I'm asking you the basis of your
4  objection.  Is it on relevancy?
5     A    I'm just simply not going to answer that
6  question.
7     Q    You have communicated with Mr. Zappin
8  through Facebook and Twitter, correct?
9     A    Again, I'm not going to answer that
10 question.
11    Q    You've shared with Mr. Zappin your
12 feelings about the lawsuit and my clients, correct?
13    A    I'm not going to answer that question.
14    Q    Mr. Zappin has also communicated with you
15 about matters related to these lawsuits, correct?
16    A    I'm not going to answer that question.
17    Q    And Mr. Zappin participated in the
18 creation of the websites that we looked at earlier,
19 correct?
20    A    I'm not going to answer any question
21 related to that.
22    Q    And in return for his help, you created
23 websites and posted about a person named Robert
24 Wallach, correct?
25    A    That is not correct, but it's partially

```
                                                    Page 180
 1   correct.
 2        Q    Tell me what part is correct.
 3        A    I did produce websites related to Robert
 4   Wallach.
 5        Q    And Robert Wallach was an attorney --
 6        A    I'm sorry.  You know what?  I'm going to
 7   object on relevance.
 8        Q    Mr. Wallach is an attorney that was in a
 9   dispute with Mr. Zappin, correct?
10        A    I am objecting on relevance.
11        Q    And you're not answering the question
12   based on that objection, true?
13        A    Correct.
14        Q    Well, let's cut to the chase.  Are you
15   going to answer any questions at all regarding Mr.
16   Zappin?
17        A    No.
18        Q    And that's based on relevancy?
19        A    No.  I'm not going to answer any questions
20   on Mr. Zappin.  I am -- the allegations surrounding
21   Robert Wallach, I am objecting to on relevance.
22        Q    Okay.  So let's talk about Mr. Zappin.
23   You've communicated with him about these lawsuits,
24   correct?
25        A    I am not going to answer any questions
```

1  related to Mr. Zappin and I'm going to make an
2  objection on asked and answered.
3       Q    And you failed to produce any documents
4  that refer or relate to communications with Mr.
5  Zappin in response to our discovery requests?  That's
6  true, correct?
7       A    I don't believe that you made any
8  discovery requests concerning anything related to
9  this individual, but in addition to this, I will
10 object on relevancy to the extent that you requested
11 documents in your requests for documents or your
12 interrogatories and then, additionally, I'm going to
13 not answer any question associated with the
14 individual in which you're referencing.
15      Q    Our document request asked for any and all
16 documents, including electronic documents that refer
17 or relate to Lindsey Middlecamp, Catherine Schaefer
18 and Grace Miller.  You've communicated with
19 Mr. Zappin regarding all three of my clients, true?
20      A    I'm not going to answer that question.
21      Q    And you haven't produced any documents
22 related to Mr. Zappin?  That's also true, isn't it?
23      A    Again, I'm not going to answer that
24 question.
25      Q    On what basis?

1      A    I'm simply not going to answer it.
2      Q    You're not going to answer about what
3  documents you produced or didn't produce in this
4  case?
5      A    I've already answered all of those
6  questions.
7      Q    The answer is no, isn't it?
8      A    The answer is no to what?
9      Q    You didn't produce any documents related
10 to Anthony Zappin?
11     A    Again, I'm not going to answer any
12 question related to that individual which you're
13 referencing.
14     Q    Do you still communicate with Mr. Zappin?
15     A    I am not going to answer any questions
16 related to the individual in which you're
17 referencing.  I'm also going to object on asked and
18 answered.
19     Q    Do you have any arrangements or agreements
20 with Mr. Zappin?
21     A    I'm not going to answer that question and,
22 again, I'm going to cite the objection of asked and
23 answered.
24     Q    Well, to be clear, it has been asked but
25 there has been no answer other than your objection.

```
                                              Page 183
 1  But you're refusing to answer any questions relating
 2  to Mr. Zappin, is that my understanding?
 3       A     Objection, asked and answered.
 4                 (Fredin Exhibit 22 was marked for
 5                 identification.)
 6  BY MR. BREYER:
 7       Q     Mr. Fredin, Exhibit 22 is the Twitter
 8  account with the handle @mncourtshq.  Do you see
 9  that?
10       A     Yes.
11       Q     This is an account that you created?
12       A     Objection, relevance.
13       Q     Are you going to answer the question?
14       A     No.
15       Q     You don't deny, then, that you did create
16  this document -- this Twitter handle?
17       A     I'm objecting on relevance.
18       Q     Much of the content in this Twitter handle
19  is in fact your post, correct?
20       A     I'm objecting on relevance.
21       Q     Do you still maintain this account?
22       A     I'm objecting on relevance.
23       Q     You're not answering the question?
24       A     I'm objecting on relevancy.
25       Q     And, again, you're refusing to answer?
```

1  A  I'm not refusing to answer. I'm just
2  objecting on relevance.
3  Q  Sure. And now I want your answer now that
4  you've given your objection. Are you going to give
5  me an answer?
6  A  No.
7          (Fredin Exhibit 23 was marked for
8          identification.)
9  BY MR. BREYER:
10  Q  So Exhibit 23 is a copy of a website that
11  was made for Catherine Schaefer and I should have
12  included it when we talked about the last two
13  websites, including the one with Grace Miller and
14  Ms. McQuitty. You created this website as well; is
15  that correct?
16  A  Objection, relevance.
17  Q  You're not going to answer the question?
18  A  No.
19  Q  If you would turn to page 3 of this
20  document you can see some of the exhibits we looked
21  at today including those referencing BlackOutx2,
22  correct?
23  A  Yes.
24  Q  And that content you posted to this
25  website?

1      A      This content appears to show Catherine
2   Schaefer's revenge pornography targeting me.  It
3   appears to show a website promoting the fact that it
4   is Catherine Schaefer indeed targeting me, violating
5   the law.  That's what I see from this document.
6      Q      That's not my question.  My question is
7   you provided this content, correct?
8      A      Objection, relevance.
9      Q      You're not going to answer the question?
10     A      No.
11     Q      Is that a no?
12     A      No.
13     Q      If you look at the remaining pages of
14  Exhibit 23, it contains additional information,
15  Facebook posts and photos, all of which were sourced
16  from you, correct?
17     A      Objection, relevance.
18     Q      Are you going to answer?
19     A      No.
20             (Fredin Exhibit 24 was marked for
21             identification.)
22  BY MR. BREYER:
23     Q      You have before you Exhibit 24, which is
24  your complaint filed in Federal District Court of
25  Minnesota against Referee Clysdale amongst others,