UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Brock Fredin,

          Plaintiff,        Court File No. 17-cv-03058 (SRN/HB)

v.

Lindsey Middlecamp,        **REPLY BRIEF IN SUPPORT OF DEFENDANT MIDDLECAMP'S MOTION FOR SUMMARY JUDGMENT**

          Defendant.

## INTRODUCTION

Plaintiff Brock Fredin's opposition brief confirms that there are no disputed material facts, and indeed, no evidence whatsoever in support of his claims.

Rather than provide this Court with his best evidence or even a clear roadmap to his claims against Middlecamp, Fredin's opposition brief spends page after page describing his grievances against this Court, its clerks, Defendant's counsel[1], and others. Stripped of these distractions and detours, his case against Middlecamp is simple: in early 2017, Middlecamp made sincere, good-faith efforts to share information with the community

---

[1] Fredin has attempted to create a false narrative around Defendant's counsel that includes allegations that he has changed his name to "escape allegations that he is related to Auscwitz [sic] guard Johann Breyer," and that he has "participated in the attempted violence, torture, and assault by engaging in extrajudicial communication with Saint Paul Police Officer David McCabe, Sarah Nasset, and Tara Patet." Counsel has no known lineage that traces back to any Auschwitz guard bearing a similar name and he has never communicated with Saint Paul Police Officer David McCabe, Sarah Nasset, or Tara Patet. (Sec. Breyer Decl. ¶ 2.) Counsel uses the abbreviated "Jon" (a variation of Johann) because that is what he has been called since childhood. *Id.* The use of K. Jon Breyer simply makes it easier for clients, attorneys, and the Court to identify him without the confusion of using a name that is seldom used. *Id.* Counsel is extremely proud of his birth name and is honored by Fredin's use of it.

about a serial predator, and Fredin has tried to silence and punish her through baseless litigation and harassment ever since.

Fredin's specific factual grievances regarding Middlecamp are: (1) that Middlecamp published a tweet in January 2017 containing accurate information (namely, that Fredin was using aliases on dating applications and had two active restraining orders against him); (2) that in February 2017, Middlecamp shared a third party's published allegation that Fredin had raped that third party in 2010; and (3) that Middlecamp communicated with individuals working for the City of Minneapolis and the City of St. Paul at various points in time in 2017 and 2018 in order to ensure she and Fredin's other victims were connected to appropriate investigators and prosecutors.

These good faith actions regarding matters of public concern do not sustain a defamation claim or a claim of intentional infliction of emotional distress. In an effort to survive summary judgment, Fredin therefore relies on conjecture and speculation about Middlecamp's motivations or methods: generally, he asserts that Middlecamp acted with malice in her communications about Fredin and, in particular, he alleges that Middlecamp fabricated the February 2017 rape allegation altogether. Fredin has set forth no specific facts from which a reasonable jury could reach either conclusion, and his claims should be dismissed.

4822-4207-2010.1

## ARGUMENT

**A.   THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT SUPPORTING FREDIN'S CLAIM THAT MIDDLECAMP FABRICATED A RAPE ALLEGATION AGAINST FREDIN**

On February 22, 2017, Middlecamp saw a public Facebook post by someone she was not acquainted with that accused Fredin of rape. (Middlecamp Decl. ¶ 2) Middlecamp contacted the individual via Facebook and offered to connect her with a rape survivor support community which Middlecamp was affiliated with. (*Id.*) The individual confirmed she was interested in being put in touch with that community. (*Id.*) During their conversation, the individual also expressed a desire to have her story shared with others. Middlecamp elected to redact the individual's name from the screenshot Middlecamp shared to her Twitter account because she did not want the individual to receive unwanted attention from strangers on the internet. (*Id.*)  Middlecamp shared the post believing the veracity of the allegation and believing it was important to share as a matter of public concern. (*Id.*)

Fredin has set forth no specific facts supporting a claim that Middlecamp acted with malice, or that she fabricated the allegation. In 2018 and 2019, Fredin elected to serve a data practices request on the City of Minneapolis, and obtained copies of police records from Ramsey County, but he made no attempt to conduct discovery regarding the February 22, 2017 rape allegation or Middlecamp's re-publication of the posting. A plaintiff resisting summary judgment "must set forth specific facts showing that there is a genuine issue for trial," and must not rely on "mere" "speculation" or "conjecture," *Kelley v. Kanios*, 383

3

F. Supp. 3d 852, 869 (D. Minn. 2019)(collecting citations.) Because Fredin relies entirely on speculation and conjecture, his claim fails.

In fact, Fredin's claim that Middlecamp fabricated a rape claim appears to be knowingly false. The February 22, 2017 Facebook post accusing Fredin of rape remains live, unedited, and publicly available. In other words, anyone with a Facebook account searching for the text of the post can find who authored it and confirm that she is a real person with an active Facebook presence. The post received 26 comments of support from other friends who know the woman to be a real person, and 12 shares by other profiles. Fredin has had the ability to search for and determine the author since 2017. Indeed, it appears Fredin did just that: he wrote his own Facebook post in or around March or April of 2017 which referred to the rape allegation and his apparent theory of who authored it ("Promoting false rape allegations (from women cheating on their fiancé in consensual intimacy)?" (Sec. Breyer Decl., Ex. 1.) During his deposition, Fredin was asked about what woman "cheating on their fiancé in consensual intimacy" he was referring to in that post. Fredin claimed to have no idea, and then objected on relevance. (*Id.*, Ex. 2.)

As further "proof" of Middlecamp's alleged malicious intent, Fredin also claims that Middlecamp sent the rape allegation to Sgt. McCabe of the St. Paul police department in an effort to get Fredin prosecuted. (Docs. 188, 14.) Of course, if this were true, reporting a credible rape allegation to law enforcement would be evidence of genuine concern, not malice. Regardless, it is another example of Fredin's pattern of inventing facts and hoping the sheer volume and chaos of his submissions will discourage fact-checking by the Court. In reality, the exhibit he cites in support of that allegation is an email from Sgt. McCabe to

4

Middlecamp from January 2017, a month before the rape allegation was even posted. (Docs. 189, 38.)

In his brief, Fredin cites a number of opinions from other courts in various jurisdictions which have denied motions for summary judgment in defamation cases. (Doc. 188; Opp. Br. at 9). The cases cited by Fredin do not support his arguments. For one thing, defamation law in Oklahoma, Ohio, and New York is different from the law in Minnesota, and these cases from foreign jurisdictions have little persuasive value and are not binding on this Court. *See, e.g., Moritz v. Town of Warwick*, No. 15-CV-5424 (NSR), 2017 WL 4785462, at *5 (S.D.N.Y. Oct. 19, 2017) (applying New York law); *Daly v. New York Life Ins. Co.*, No. 1:12CV125, 2017 WL 4349032, at *6 (S.D. Ohio Sept. 30, 2017) (applying Ohio law). More importantly, Fredin does not attempt to articulate how these cases apply to this case. The cases cited by Fredin do not save him. If anything, they articulate why summary judgment is appropriate for Middlecamp.

Although Fredin seemingly disputes everything, he has presented no actual evidence that supports the notion that there is a genuine issue of material fact to be decided by a jury. His claims should be dismissed.

**B.  THERE IS NO EVIDENCE OF DAMAGES**

Fredin fails to point to any evidence that shows that he has been damaged as a result of the alleged defamatory statement. In his opposition brief he lists broad categories of damages based on "the litany of *allegations* contained in the pleadings," including "(1) loss of professional livelihood; (2) standing in the community; and (3) and many other allegations that were never plead, including "the deprivation of liberty, deprivation of

5

access to family, and more." (Doc. 188; Opp. Br. at 12) (emphasis supplied). Fredin fails to grasp that at this stage of the proceeding he must produce actual *evidence* that substantiate his claims—not simply recite the allegations in his pleadings. *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990). In that regard, Fredin once again comes up short. He fails to establish that the truthful statement proximately caused the loss of his job or that he was denied employment because of the offending statement. He fails to demonstrate that, or even describe the manner in which, his "standing in the community" has been impacted. And his last category of "damages" does not appear to list any specific ways in which he was damaged, and even if it did, he has failed to attempt to connect any damages to the statements at issue in this case.

### C.     FREDIN'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS

Fredin does not refute, or even respond to, Defendant's argument that if his defamation claim fails, then his claim for intentional infliction of emotional distress ("IIED") must also fail. *See Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 874 (Minn. 2019); (Doc. 180; Def.'s Mem. in Supp. of Summ. J. at 10–11).  Nevertheless, in an attempt to save his IIED claim, Fredin once again cites to multiple cases from outside Minnesota, which apply the IIED law of different states to fact patterns that are wholly unlike the one here. (*See* Doc. 188; Opp. Br. at 13). For example, Fredin tries to draw comparisons between himself and the plaintiffs in *Conroy v. Caron*, a Connecticut § 1983 case against a town and its police officers in which there was sufficient evidence for a jury to find that officers used excessive force against plaintiff in kicking him and putting a knee to his head. 275 F.Supp.3d 328, 345 (D. Conn. 2017). Under those facts, the court found

6

that "triable issues of fact" precluded summary judgment on plaintiff's IIED claim. *Id*. at 355.

But the "egregious conduct" in this case is Defendant's sharing credible allegations of sexual violence and other misconduct by Fredin originating from third parties. (Doc. 5; AC ¶ 42). Moreover, the statement served a legitimate public purpose—protecting potential future victims from Fredin's harassment. The text message excerpt cite does nothing to suggest that the statements at issue in this case—and the underlying rape allegation—are false. (Doc. 188; Opp. Br. at 14).

Finally, Fredin has once again failed to demonstrate any damages. Specifically, he has failed to show that Defendant's statement somehow caused him to become homeless and bankrupt. Moreover, he admits that he has no documented diagnosis or any sort of evidence from a healthcare provider that his emotional health suffered as a result of Defendant's statement. (*Id*. at 15).

In sum, Fredin has attempted to spin of web of "facts" and allegations that he is sure are all connected in one giant conspiracy against him. But Fredin's version of events is not one that any reasonable juror could believe. Therefore, Defendant respectfully asks that the Court enter summary judgment against Fredin on all claims.

## CONCLUSION

The communications Fredin has produced from his data practices requests to the City of Minneapolis clearly demonstrate that Middlecamp was acting in good faith and based on genuine concern about Fredin's conduct harassing and stalking women in the Twin Cities community. Her communications are all transparent and unambiguous in their

7

intentions: to connect other victims with points of contact to discuss their own investigations or prosecutions, and to keep law enforcement apprised of ongoing suspected violations by Fredin of restraining orders in place against him. None of the communications by Middlecamp, either taken individually or viewed collectively, present a disputed issue of material fact or even a scintilla of evidence showing outrageous conduct or malice.

Although truth is an absolute defense to claims of defamation, this Court is not tasked at the summary judgment stage with ruling that Fredin committed a rape in 2010 or that he has been a serial harasser. Instead, this Court is tasked with evaluating whether Fredin has produced any specific facts which could establish the required elements for his claim. Because he has not, and cannot, his suit should be dismissed with prejudice.

Date:  September 3, 2020         **KUTAK ROCK LLP**

By: */s/ K. Jon Breyer*
K. Jon Breyer (MN #302259)
60 South Sixth Street
Suite 3400
Minneapolis, Minnesota 55402
Telephone:   (612) 334-5057
Jon.breyer@kutakrock.com

***Attorney for Defendant Lindsey Middlecamp***